# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| WHITNEY MAIN, HENRY SCHMIDT and DANIEL GRENTZ, individually and as representatives of a class of similarly situated persons, and on behalf of the American Airlines, Inc., 401(k) Plan, | § § § § § | |
| | § | Case No. 3:16-cv-01033-C |
| Plaintiffs, | § § | |
| | § | **ORAL ARGUMENT REQUESTED** |
| v. | § § | |
| AMERICAN AIRLINES INC., PENSION ASSET ADMINISTRATION COMMITTEE, BENEFITS STRATEGY COMMITTEE, PENSION BENEFITS ADMINISTRATION COMMITTEE, EMPLOYEE BENEFITS COMMITTEE, AND JOHN DOES 1-90, | § § § § § § § § | |
| Defendants. | § | |

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT

Dee J. Kelly, Jr. (S.B. # 11217250)
Lars L. Berg (S.B. # 00787072)
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Tel.: (817) 332-2500
Fax: (817) 878-9280
dee.kelly.2@kellyhart.com
lars.berg@kellyhart.com

Brian D. Boyle (*pro hac vice pending*)
(D.C. Bar # 419773)
Shannon M. Barrett (*pro hac vice pending*)
(D.C. Bar # 476866)
Meaghan VerGow (*pro hac vice pending*)
(D.C. Bar # 977165)
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Tel.: (202) 383-5300
Fax: (202) 383-5300
bboyle@omm.com
sbarrett@omm.com
mvergow@omm.com

*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................. 1

BACKGROUND .................................................................................................................... 2

ARGUMENT .......................................................................................................................... 4

I. COUNT I SHOULD BE DISMISSED BECAUSE PLAINTIFFS'
DISLOYALTY THEORY IS UNDERCUT BY THEIR OWN
ALLEGATIONS AND THEY HAVE FAILED TO ALLEGE
SUFFICIENT FACTS TO INFER AN IMPRUDENT FIDUCIARY
PROCESS ..................................................................................................... 5

    A. Plaintiffs Have Failed To Allege A Viable Theory Of Disloyalty ............ 6

    B. Plaintiffs' Theories Of Imprudence Do Not Support A Valid Claim
    For Relief ..................................................................................................... 9

        1. Defendants Had No Duty To Seek Out The Cheapest
        Possible Index Funds .................................................................. 11

        2. Plaintiffs Have Failed To State A Claim For The Failure To
        Remove Underperforming Funds ................................................ 14

    C. It Was Not Imprudent To Include Mutual Funds In The Plan
    Lineup ......................................................................................................... 20

    D. Count I Should, At A Minimum, Be Dismissed Against The
    Defendants Not Responsible For The Selection Of The Plan's
    Investment Options .................................................................................... 22

II. COUNT II SHOULD BE DISMISSED BECAUSE PLAINTIFFS FAIL
TO STATE A CLAIM FOR THE BREACH OF THE DUTY TO
MONITOR .................................................................................................... 23

CONCLUSION ..................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## <u>CASES</u>

*Armstrong v. LaSalle Bank Nat'l Ass'n*,
  446 F.3d 728 (7th Cir. 2006) ............................................................................ 10

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).......................................................................................... 6

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).......................................................................................... 4, 9

*Braden v. Wal-Mart Stores, Inc.*,
  588 F.3d 585 (8th Cir. 2009) ............................................................................ 11

*Bunch v. W.R. Grace & Co.*,
  555 F.3d 1 (1st Cir. 2009) ............................................................................ 7, 19

*Bussian v. RJR Nabisco, Inc.*,
  223 F.3d 286 (5th Cir. 2000) ............................................................................ 7

*Caterino v. Barry*,
  8 F.3d 878 (1st Cir. 1993) (Breyer, J.)............................................................. 10

*Chao v. Merino*,
  452 F.3d 174 (2d Cir. 2006)............................................................................. 10

*Chesemore v. Alliance Holdings, Inc.*,
  886 F. Supp. 2d 1007 (W.D. Wis. 2012) ......................................................... 23

*Coyne & Delany Co. v. Selman*,
  98 F.3d 1457 (4th Cir. 1996) ............................................................................ 24

*Fener v. Belo Corp.*,
  513 F. Supp. 2d 733 (N.D. Tex. 2007) ............................................................. 5

*Fifth Third Bancorp v. Dudenhoeffer*,
  134 S. Ct. 2459 (2014)...................................................................................... 10, 11

*Hecker v. Deere & Co.*,
  556 F.3d 575 (7th Cir. 2009) ................................................................. 4, 8, 11, 21

*Howell v. Motorola, Inc.*,
  633 F.3d 552 (7th Cir. 2011) ............................................................................ 25

*Hozier v. Midwest Fasteners, Inc.*,
  908 F.2d 1155 (3d Cir. 1990)............................................................................ 22

*In re BP p.l.c. Sec. Litig.*,
  2015 WL 6674576 (S.D. Tex. Oct. 30, 2015)................................................... 24

ii

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*In re Capstead Mortg. Corp. Sec. Litig.*,
  258 F. Supp. 2d 533 (N.D. Tex. 2003) ................................................................. 5

*Jenkins v. Yager*,
  444 F.3d 916 (7th Cir. 2006) ........................................................................... 19

*Johnson v. Ga.-Pac. Corp.*,
  19 F.3d 1184 (7th Cir. 1994) .......................................................................... 22

*Kopp v. Klein*,
  722 F.3d 327 (5th Cir. 2013) .......................................................................... 24

*Laborers Nat'l Pension Fund v. N. Trust Quantitative Advisors, Inc.*,
  173 F.3d 313 (5th Cir. 1999) .......................................................................... 19

*Laboy v. Bd. of Trustees of Bldg. Serv. 32 BJ SRSP*,
  2012 WL 3191961 (S.D.N.Y. Aug. 7, 2012) ..................................................... 13

*Loomis v. Exelon Corp.*,
  658 F.3d 667 (7th Cir. 2011) .......................................................................... 21

*New Orleans City v. Ambac Assurance Corp.*,
  815 F.3d 196 (5th Cir. 2016) ............................................................................ 4

*New Orleans Employers Int'l Longshoremen's Ass'n., AFL-CIO Pension Fund v.
  Mercer Inv. Consultants*,
  635 F. Supp. 2d 1351 (N.D. Ga. 2009) ....................................................... 14, 19

*Oceaneering Int'l, Inc. v. Cross Logistics, Inc.*,
  2014 WL 2462810 (S.D. Tex. June 2, 2014) ...................................................... 5

*Pegram v. Herdrich*,
  530 U.S. 211 (2000).......................................................................................... 22

*Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan
  Stanley Inv. Mgmt. Inc.*,
  712 F.3d 705 (2d Cir. 2013)........................................................................ 11, 19

*Perez v. Bruister*,
  __ F.3d __, 2016 WL 2343009 (5th Cir. May 3, 2016) ..................................... 23

*Ramirez v. J.C. Penney Corp.*,
  2015 WL 5766498 (E.D. Tex. Sept. 29, 2015) .................................................. 24

*Renfro v. Unisys Corp.*,
  671 F.3d 314 (3d Cir. 2011)............................................................................. 21

iii

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Rinehart v. Akers*,
  722 F.3d 137 (2d Cir. 2013) ................................................................ 24

*Taylor v. United Techs. Corp.*,
  2009 WL 535779 (D. Conn. Mar. 3, 2009) ......................................... 21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ............................................................................. 4

*Tibble v. Edison Int'l*,
  135 S. Ct. 1823 (2015) ....................................................................... 10

*Tibble v. Edison Int'l*,
  729 F.3d 1110 (9th Cir. 2013) .................................................. 10, 11, 21

*United States v. 50 Acres of Land, More or Less, Situated in Dallas Cty., State of Tex.*,
  529 F. Supp. 220 (N.D. Tex. 1981) ..................................................... 5

*Van Billiard v. Farrell Distrib. Corp.*,
  2009 WL 4729965 (D. Vt. Dec. 3, 2009) ............................................ 5

## STATUTES

15 U.S.C. § 80a-8 ................................................................................ 21

15 U.S.C. § 80a-18(a)(1)-(f) ............................................................... 21

15 U.S.C. § 80a-30 .............................................................................. 21

15 U.S.C. § 7241(a) ............................................................................ 21

26 U.S.C. § 851(b)(3) ......................................................................... 21

29 U.S.C. § 1002(21)(A) ..................................................................... 22

29 U.S.C. § 1002(21)(B) ..................................................................... 21

29 U.S.C. § 1108(b)(8) ......................................................................... 7

## REGULATIONS

17 C.F.R. § 230.482(b)(3)(i) ............................................................... 14

17 C.F.R. § 270.0-1(a)(7) .................................................................... 21

17 C.F.R. § 270.38a-1 ......................................................................... 21

29 C.F.R. § 404c-1(b) ........................................................................... 3

**TABLE OF AUTHORITIES**
(continued)

Page(s)

## FEDERAL REGISTER

42 Fed. Reg. 18734, Prohibit Transaction Exemption 77-3, Class Exemption Involving Mutual Fund In-House Plans Requested by the Investment Company Institute (Apr. 8, 1977) .................................................................................................................... 7

66 Fed. Reg. 35676–01, *In re Hillview Investment Trust II and Hillview Capital Advisors, LLC*, Investment Company Act Release No. 25055 (July 6, 2001) ....................... 16

## OTHER AUTHORITIES

American Beacon Funds, American Beacon Large Cap Growth Fund Summary Prospectus (Form 497k) (Mar. 1, 2011) .................................................................... 15

American Beacon Funds, American Beacon Short-Term Bond Fund Summary Prospectus (Form 497k) (Mar. 1, 2011) .................................................................... 18

American Beacon Funds, Certified Shareholder Report of Registered Management Investment Companies (Form N-CSR) (Jan. 7, 2011) ............................................ 16

American Beacon Funds, Certified Shareholder Report of Registered Management Investment Companies (Form N-CSR) (Jan. 1, 2013) ............................................ 18

American Beacon Funds, Certified Shareholder Report of Registered Management Investment Companies (Form N-CSR) (Mar. 7, 2013) .......................................... 12

American Beacon Funds, Certified Shareholder Report of Registered Management Investment Companies (Form N-CSR) (Mar. 9, 2015) ............................................ 8

American Beacon Funds, Certified Shareholder Report of Registered Management Investment Companies (Form N-CSR) (Mar. 10, 2016) ........................................ 17

American Beacon Funds, Registration Statement Under the Securities Act of 1933 (Form N-1A) (Feb. 27, 2009) ............................................................................... 15

American Beacon Funds, Registration Statement Under the Securities Act of 1933 (Form N-1A) (May 4, 2010) ................................................................................ 19

Ben Baden, *When Will The Fed Finally Raise Rates?*, US News & World Rpt. (Apr. 28, 2010) .................................................................................................................... 20

Barclays, *Benchmark Definitions* ................................................................................. 19

DOL, ABC Plan 401(k) Plan Fee Disclosure Form for Services Provided by XYZ Company ............................................................................................................... 12

DOL, *Report of the Working Group on Exploring the Utilization of Third-Party Trustees to Protect Plan Participants* (Nov. 13, 1996) .......................................................... 7

v

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

BlackRock, Inflation Protected Bond Fund ................................................................................. 17

Fidelity Concord Street Trust, Certified Shareholder Report of Registered Management
   Investment Companies (Form N-CSR) (April 25, 2013) ........................................................ 12

Financial Industry Regulatory Authority, *Duration—What an Interest Rate Hike Could
   Do to Your Bond Portfolio* (Mar. 2013) ............................................................................... 18

Investment Company Institute, *Are S&P 500 Index Mutual Funds Commodities,*
   Perspective Vol. 11 No. 3 (Aug. 2005) ................................................................................. 13

David C. Johnston, *Vanguard Whistleblower Could Get Billions in Tax Dodge
   Complaint*, Newsweek (Dec. 3, 2015) .................................................................................. 13

Tom Lauricella, *A Safer Junk Strategy*, Wall St. J. (Oct. 3, 2012) .............................................. 18

Morningstar, *The Morningstar Category Classifications* (Apr. 29, 2016) .................................... 17

SEC, *Beginners' Guide to Asset Allocation, Diversification, and Rebalancing* ......................... 17

SEC, *Bonds* ............................................................................................................................... 18

SEC, *Invest Wisely: An Introduction to Mutual Funds* ............................................................... 14

Wall Street Journal, *Economic Forecasting Survey*, Wall St. J.  (Jan. 2011) .............................. 20

Defendants American Airlines, Inc. ("American Airlines"), the Pension Asset

Administration Committee ("PAAC"), the Benefits Strategy Committee ("BSC"), the Pension

Benefits Administration Committee ("PBAC"), and the Employee Benefits Committee ("EBC"),

respectfully submit this memorandum in support of their motion to dismiss the Complaint for

failure to state a claim under the Employee Retirement Income Security Act of 1974 ("ERISA").

## INTRODUCTION

Plaintiffs ask this Court to second-guess decisions by fiduciaries of the American Airlines

401(k) Plan regarding the menu of investment options made available to the Plan's participants.

Plaintiffs' principal criticism is that at least some of the Plan's investment options were not the

cheapest products available on the market.  As numerous courts have explained, however,

cheaper is not necessarily better, and fiduciaries have no duty to pursue barrel bottom prices at

the expense of other considerations.  Indeed, courts have applied that reasoning to dismiss one of

the very theories that Plaintiffs press here—that the Plan fiduciaries were required to offer

cheaper institutional investment products instead of mutual funds—recognizing that mutual

funds offer advantages those other products do not.  Similar logic precludes Plaintiffs' separate

claim that the Plan's fiduciaries had a duty to pick the cheapest available index funds.

Plaintiffs' remaining theory—that the Plan's fiduciaries should have immediately

removed certain investment options from the Plan in the face of alleged underperformance—is

likewise insufficient.  ERISA does not require rashness.  An investment strategy that trails in one

set of economic conditions may thrive in others, and a prudent fiduciary can reasonably decide to

monitor a fund's performance over the long-term before making an ultimate removal decision.

Plaintiffs' Complaint does not take these possibilities into account, and their effort to infer an

imprudent fiduciary process from the mere fact that the fiduciaries did not remove the challenged

funds from the Plan's lineup as quickly as Plaintiffs would have preferred is inadequate.

1

Plaintiffs' bid to bolster their shopworn and invalid imprudence claims by wrapping them in a theory of disloyalty likewise fails. Plaintiffs contend that the Plan fiduciaries' investment decisions were driven by a desire to favor American Beacon—a one-time subsidiary of American Airlines that served as investment manager to a number of challenged Plan investment options. But the central premise of their disloyalty theory—that when American Airlines' parent sold American Beacon, it sweetened the deal by committing the Plan to the continued use of American Beacon's services—is undercut by the very materials that Plaintiffs rely on to assert it. Those materials show that American Airlines prevented any such commitment by subjecting any further Plan use of American Beacon to the approval of an independent third-party fiduciary. Plaintiffs' other allegations, in turn, do nothing to raise Plaintiffs' disloyalty accusations above the level of base conjecture. The Complaint should be dismissed accordingly.

## BACKGROUND

American Airlines is the sponsor of a 401(k) plan known as the American Airlines, Inc. 401(k) Plan (the "Plan," formerly known as the "$uper $aver"). Compl. ¶¶ 18, 23; *see generally* Declaration of Shannon Barrett in Support of Defendants' Motion to Dismiss ("Barrett Decl.") Ex. A ("Plan SPD").[1] The Plan enables eligible American Airlines employees to save for retirement by investing a portion of their salary through individual Plan accounts in one or more of the numerous options offered in the Plan's investment option lineup. Compl. ¶¶ 21-22; 2016 Plan SPD, at AA-APP007-008; Barrett Decl. Ex. B ("2010-14 Plan Form 5500s"), at AA-APP055-59, AA-APP067-71, AA-APP079-82, AA-APP091-95, AA-APP102-108 (listing Plan investment options). Subject to IRS regulations governing maximum employee contributions,

---

[1] The Court may consider documents incorporated into the Complaint by reference (such as the Plan document and Summary Plan Description ("SPD")), and judicially noticeable materials (such as Forms 5500 filed with the Department of Labor ("DOL")). *See infra* at 4-5.

individual Plan participants are responsible for deciding whether to invest, how much to invest, and in which options to invest.  Compl. ¶¶ 21-22; Plan SPD, at AA-APP007-008.

Like other employer-sponsored retirement plans, the Plan is governed by ERISA. Compl. ¶¶ 19-20.  DOL regulations strongly encourage fiduciaries of ERISA-governed plans to make at least three investment options available from which participants may choose.  29 C.F.R. § 404c-1(b).  The Plan included around 30 investment options, and made numerous others available through its self-directed brokerage window.  *See, e.g.*, Compl. ¶ 44; Plan SPD, at AA-APP008; 2010-14 Plan Form 5500s, at AA-APP058-059, AA-APP070-071, AA-APP082-083, AA-APP095-096, AA-APP108-09.  These options ranged from, *inter alia*, domestic and international equity funds (including several index funds), to bond funds with varying risk profiles.  *Id.*

Several of the Plan's investment options are (and have been in the past) managed by American Beacon Advisors, Inc. ("American Beacon"), a company that until 2008 was a wholly-owned subsidiary of American Airlines' parent company, AMR Corp.  Compl. ¶ 4.  In 2008, AMR Corp. sold American Beacon to Lighthouse Holdings, Inc. ("Lighthouse").  *Id.*  As part of the sale, AMR Corp. acquired a "small equity stake" in Lighthouse.  *Id.* ¶ 59.  In connection with the transaction, an independent third-party reviewed the Plan's use of the American Beacon funds, and approved the post-sale use of the funds as prudent.  *Id.* ¶ 58.

In October 2015, as part of a corporate merger between AMR Corp. and US Airways Group Inc., the US Airways 401(k) plan was merged into the Plan.  2010-14 Plan Form 5500s, at AA-APP102.  In connection with the merger, the Plan fiduciaries revamped the Plan lineup to limit it to 26 investment options (rather than retaining the more than 62 distinct options that had been in one of the two plans).  2010-14 Plan Form 5500s, at AA-APP108 (listing at least 28 Plan

options); Barrett Decl. Ex. C ("2014 US Airways Form 5500"), at AA-APP119 (listing at least

34 options in the US Airways 401(k) plan); Barrett Decl. Ex. D ("Plan Investment Guide"), at

AA-APP165-66 (showing 26 options in overhauled Plan lineup).  Various changes were also

made to the Plan's fiduciary structure.  Before October 27, 2015, the Plan fiduciary primarily

responsible for the selection and monitoring of Plan investment options was the PAAC, and

PAAC members were appointed by the BSC.  Compl. ¶¶ 24-25;  Barrett Decl. Ex. E ("2009 Plan

Document"), §§ 2.72 (AA-PP194), 12.2 (AA-APP248-49), 12.4 (AA-APP250-51); Barrett Decl.

Ex. F ("2014 Plan Document"), §§ 2.19 (AA-APP380), 2.74 (AA-APP392-93), 12.2 (AA-

APP451-52), 12.4 (AA-APP453-54).   After the merger, the PAAC was dissolved (along with

the P*B*AC—a fourth committee, previously responsible for, *inter alia*, the selection of Plan

administrative service providers), and the EBC assumed responsibility for the selection and

monitoring of Plan investment options.  Compl. ¶¶ 26-27; 2009 Plan Document §§ 2.73 (AA-

APP194-195), 9.12 (AA-APP230), 12.3 (AA-APP249-250); 2014 Plan Document §§ 2.75 (AA-

APP393), 9.12 (AA-APP443), 12.3 (AA-APP452-53); Barrett Decl. Ex. G ("2015 Plan

Document"), §§ 2.22 (AA-APP592), 12.2 (AA-APP661-62).

## ARGUMENT

For a complaint "to survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead

'enough facts to state a claim to relief that is plausible on its face.'"  *New Orleans City v. Ambac

Assurance Corp.*, 815 F.3d 196, 200 (5th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 570 (2007)).  In ruling on such a motion, a court may consider, in addition to the

pleadings, "documents incorporated into the complaint by reference, and matters of which a

court may take judicial notice."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322

(2007); *see also Hecker v. Deere & Co.*, 556 F.3d 575, 582-83 (7th Cir. 2009) (considering

supplements to incorporated summary plan descriptions because they "serve much the same

purpose as the originals").  Judicially noticeable documents include a plan's public filings with the DOL or Securities & Exchange Commission ("SEC").  *See In re Capstead Mortg. Corp. Sec. Litig.*, 258 F. Supp. 2d 533, 543 n.2 (N.D. Tex. 2003) (considering SEC filings); *Van Billiard v. Farrell Distrib. Corp.*, 2009 WL 4729965, at *2-3 (D. Vt. Dec. 3, 2009) (considering DOL filings).  They also include documents describing the price of publicly-traded securities and the returns of their benchmarks.  *See, e.g.*, *Fener v. Belo Corp.*, 513 F. Supp. 2d 733, 737 & n.2 (N.D. Tex. 2007) (noticing "a stock price chart"); *Oceaneering Int'l, Inc. v. Cross Logistics, Inc.*, 2014 WL 2462810, at *31 (S.D. Tex. June 2, 2014) (noticing "several published benchmarks").[2]

I.      **COUNT I SHOULD BE DISMISSED BECAUSE PLAINTIFFS' DISLOYALTY THEORY IS UNDERCUT BY THEIR OWN ALLEGATIONS AND THEY HAVE FAILED TO ALLEGE SUFFICIENT FACTS TO INFER AN IMPRUDENT FIDUCIARY PROCESS**

Plaintiffs' Count I, which asserts that Defendants breached fiduciary duties by failing to remove allegedly imprudent investment options, packages together three distinct claims: (1) that the Defendants retained American Beacon index funds in the Plan's investment lineup when cheaper alternatives were available; (2) that they retained allegedly poor-performing American Beacon funds in the lineup; and (3) that they included mutual funds (rather than separate accounts or collective trusts) as Plan investment options.  Plaintiffs attempt to weave these theories together by theorizing that Defendants' decisions to retain the challenged investments were driven by an overarching desire to favor American Beacon rather than serve the best interests of the Plan.  This theory of disloyalty,  however, amounts to no more than rank

---

[2] *See also United States v. 50 Acres of Land, More or Less, Situated in Dallas Cty., State of Tex.*, 529 F. Supp. 220, 224 n.1 (N.D. Tex. 1981) (observing that courts have "taken [] notice of [benchmarks] such [] as the … Moody's Composite Index of Yield on Long Term Corporate Bonds"), *rev'd on other grounds*, 706 F.2d 1356 (5th Cir. 1983), *rev'd*, 469 U.S. 24 (1984).

speculation that is undermined by the very materials on which Plaintiffs rely, and each of Plaintiffs' theories of imprudence are insufficient as a matter of law.

### A.  Plaintiffs Have Failed To Allege A Viable Theory Of Disloyalty

Plaintiffs' effort to suggest that the Plan's fiduciaries were motivated to pursue American Beacon's interests over Plan participants' largely centers on the assertion that "discovery will show" that as a term of its sale of American Beacon to Lighthouse in 2008, AMR Corp. agreed to keep various American Beacon funds in the Plan lineup.  Compl. ¶ 57.  But the Complaint itself makes clear that this is baseless conjecture that the Court need not and should not credit. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that Rule 8's plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully").  The Complaint cites as the basis for its assertion a press release reporting that "American Beacon will continue to provide a number of services for AMR and its affiliates, including … investment management services for American Airlines pension, 401(k) and other health and welfare plans."  Compl. ¶ 58 (emphasis omitted).  But, as the Complaint itself reflects, the press release also disclosed that "[a]n independent third party reviewed and approved the continuing relationship between American Beacon and [the] American Airlines … plans to satisfy the fiduciary duties and other rules that apply to these plans."  *Id*.  The press release thus indicates that the Plan's fiduciaries took a course of action that courts and the DOL have lauded as an appropriate means for resolving potential conflicts of interest—turning the decision of whether to use American Beacon over to an independent, third-party fiduciary (and thereby denying AMR Corp. the ability to

promise the Plan's continued business as  part of the sale).[3]  The press release relied on by

Plaintiffs is, in short, indicative of sound and faithful fiduciary practice, not disloyalty.[4]

Plaintiffs also point out that AMR Corp. retained a "small equity stake" in Lighthouse

Holdings.  Compl. ¶ 59.  But mere ownership by AMR Corp. of a small stake in American

Beacon's parent does not signal disloyalty.  Indeed, in crafting ERISA and its surrounding

regulatory structure, Congress and the DOL promulgated exemptions to ERISA's prohibited

transaction rules that are specifically designed to allow plan investments in options managed not

only by entities wholly-owned by the plan's sponsor but even by the plan sponsor itself.  *See*

Prohibit Transaction Exemption ("PTE") 77-3, Class Exemption Involving Mutual Fund In-

House Plans Requested by the Investment Company Institute, 42 Fed. Reg. 18734, 18735 (Apr.

8, 1977) (permitting, under stated conditions, the sale of mutual fund shares to a plan that covers

employees of the mutual fund investment advisor's affiliates); ERISA § 408(b)(8), 29 U.S.C. §

1108(b)(8) (similar exception to prohibited transaction rules for pooled investment funds

---

[3] *See, e.g.*, *Bunch v. W.R. Grace & Co.*, 555 F.3d 1, 8 (1st Cir. 2009) ("[U]pon concluding that the decisions required of Grace management … augured a potential conflict of interest with Grace's fiduciary duties, Grace took the eminently correct decision of insulating itself from that possibility.… It [] delegated the relevant decisional power to an independent third party … to render its expert, unbiased assessment of the Grace stock, and to execute its autonomous determination."); *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 299 (5th Cir. 2000) ("[T]he level of precaution necessary to relieve a fiduciary of the taint of a potential conflict should depend on the circumstances.… In some instances, the only open course of action may be to appoint an independent fiduciary."); DOL, *Report of the Working Group on Exploring the Utilization of Third-Party Trustees to Protect Plan Participants* (Nov. 13, 1996), https://www.dol.gov/ebsa/pu blications/3dparty.htm (explaining that "[t]he benefits of utilizing independent third-parties [as fiduciaries] include enhanced expertise, independence in decision-making regarding transactions involving plan assets and a party in interest and additional safeguards over the flow of monies in and out of a plan together with cross-checks to ensure accuracy.").

[4] The Complaint attempts to blunt the significance of the independent fiduciary by citing authorities that obtaining independent expert *advice* does not in and of itself satisfy a fiduciary's duty of prudence.  Compl. ¶ 58 n.3.  But the press release does not state that the Plan's fiduciaries merely sought independent advice; it affirmatively states that the independent fiduciary "*approved*" the continued use of American Beacon.  *Id.* ¶ 58 (emphasis added).

7

maintained by banks and insurance companies).  It makes no sense to assume that, in explicitly

permitting plans to invest in options with which the plan sponsors have some connection,

Congress intended for courts to infer disloyalty merely because a plan's fiduciaries make that

election.  And such an inference makes even less sense here, where, as the Complaint reflects,

the decision to stay with American Beacon post-sale was made by an independent fiduciary.

Finally, Plaintiffs seek to gain traction for their claim from the number of American

Beacon funds in the Plan's lineup at various times, alleging that, at one point, "approximately

half" of the Plan's investment option were American Beacon funds, but that "months after"

Lighthouse sold American Beacon in 2015, all of those were removed from the Plan.  Compl.

¶¶ 4, 64.  There is, however, nothing unusual about a plan fiduciary selecting multiple funds

from a single fund company.  As the Seventh Circuit explained in *Hecker*, "many prudent

investors limit themselves to funds offered by one company and diversify within the available

investment options."  *Hecker*, 556 F.3d at 586.  The Plan's fiduciaries here were not so

restrictive.  In almost every asset class, the fiduciaries offered both an American Beacon fund

and an unaffiliated alternative so that participants could construct a diversified portfolio without

investing their accounts in a single American Beacon fund.  2010-14 Plan Form 5500s, at AA-

APP0058-059, AA-APP070-071, AA-APP082-083, AA-APP095-096, AA-APP108-09.  Nor can

it be reasonably inferred that the fiduciaries stuffed American Beacon funds into the Plan lineup

without regard to their individual merit.  To the contrary, the lineup excluded numerous

American Beacon funds, including funds from multiple asset classes otherwise included in the

Plan.[5]  And, when the Plan's fiduciaries decided to remove the American Beacon Large Cap

---

[5] *Compare, e.g.*, 2010-14 Plan Form 5500s, at AA-APP108 (listing only 13 American
Beacon funds as of December 31, 2014, and mid-cap growth and small-cap growth funds
managed by other firms) *with* American Beacon Funds, Certified Shareholder Report of

Growth fund from the lineup in 2012, they declined to replace it with one of the other American Beacon funds in the large-cap growth space.[6]

Plaintiffs' suggestion, in turn, that the fiduciaries abandoned American Beacon as an investment manager once it was sold by Lighthouse is simply incorrect:  the Plan continues to include multiple investment options managed in whole or part by American Beacon.  Plan Investment Guide, at AA-APP152, AA-APP156, AA-APP158.  To be sure, a number of American Beacon funds were removed from the Plan's lineup in Fall 2015, but so were numerous funds with no connection to American Beacon whatsoever.  Following the corporate merger of AMR Corp. with US Airways Group Inc., the US Airways 401(k) plan merged into the Plan effective October 2015.  *See supra*, at 3-4.  Rather than retain the more than 62 distinct investment options that had been in one of the two plans, the Plan's fiduciaries trimmed the Plan's investment option lineup to a more manageable universe of 26 core investment options.  *Id.*  Given this substantial streamlining, it is neither surprising nor suspect that American Beacon funds were among the removed options.  *See Twombly*, 550 U.S. at 567 (explaining that a Court may assume a lawful business practice where the practice is at least equally compatible with alleged facts as illicit practice).

### B.   Plaintiffs' Theories Of Imprudence Do Not Support A Valid Claim For Relief

Stripped of Plaintiffs' baseless speculation concerning Defendants' motives, Plaintiffs' Count I reduces to a series of theories that Defendants acted imprudently by not removing Plan

---

Registered Management Investment Companies (Form N-CSR) (Mar. 9, 2015) (excerpt attached as Barrett Decl. Ex. H, at AA-APP693), https://www.sec.gov/Archives/edgar/data/809593/00011 9312515081365/d883695dncsr.htm (showing American Beacon offered at least 31 funds as of Mar. 9, 2015, including a mid-cap growth fund and small-cap growth fund).

[6] *Compare* Ex. H, at AA-APP690 (noting existence of American Beacon Holland Large Cap Growth Fund) *with* 2010-14 Plan Form 5500s, at AA-APP082, AA-APP095, AA-APP108 (listing two other large-cap growth funds).

investment options when cheaper alternatives may have been available or when certain of the options experienced periods of alleged underperformance.  Plaintiffs, however, do not plead sufficient facts to establish imprudence under any of these theories.

A claim of fiduciary imprudence under ERISA requires a plaintiff to allege facts showing that the fiduciary did not act "with the care, skill, prudence, and diligence that a prudent person acting in a like capacity and familiar with such matters would use."  *Tibble v. Edison Int'l* ("*Tibble II*"), 135 S. Ct. 1823, 1828 (2015) (quotations omitted).  Fiduciary decision-making typically requires a "balancing of competing interests under conditions of uncertainty," and ERISA's duty of prudence does not seat fiduciaries on a "razor's edge" in striking that balance. *Armstrong v. LaSalle Bank Nat'l Ass'n*, 446 F.3d 728, 733 (7th Cir. 2006); *see also Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006) (noting that the prudent-person standard does not require a fiduciary to take "any particular course of action if another approach seems preferable" (quotation omitted)); *Caterino v. Barry*, 8 F.3d 878, 883 (1st Cir. 1993) (Breyer, J.) ("[W]e do not simply substitute our judgment for that of the trustees," but rather "review the trustees' decision at a distance").  Rather, the exercise of fiduciary discretion is reviewed "deferentially" for an "abuse of discretion," *Armstrong*, 446 F.3d at 733, in light of "the circumstances … prevailing at the time the fiduciary act[ed]," *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2471 (2014) (quotations omitted).  In short, a fiduciary's prudence is judged by process, not outcome.  *Tibble v. Edison Int'l* ("*Tibble I*"), 729 F.3d 1110, 1136 (9th Cir. 2013), *vac'd on other grounds*, *Tibble II*, 135 S. Ct. 1823 (2015).  "[T]he primary question is whether the fiduciaries, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment."  *Id.* (quotation omitted).

Where, as here, a complaint contains no allegations actually addressing the fiduciaries' decision-making process, a plaintiff can only survive dismissal by alleging facts that, if accepted as true, would show that a prudent fiduciary under like circumstances would not and could not have made the same investment decisions. *See Dudenhoeffer*, 134 S. Ct. at 2473 (instructing that, in reviewing claims that fiduciaries failed to discontinue investment, courts must consider "whether the complaint has plausibly alleged that a prudent fiduciary in the defendant's position could not have concluded that stopping purchases … would do more harm than good"); *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 720 (2d Cir. 2013) (absent direct allegations of fiduciaries' decision-making, ERISA standard "generally requires the plaintiff to allege facts, accepted as true, showing that a prudent fiduciary in like circumstances would have acted differently."). The Complaint fails that pleading standard.

1. *Defendants Had No Duty To Seek Out The Cheapest Possible Index Funds*

Plaintiffs' first Count I imprudence theory is that the fiduciaries acted imprudently by including American Beacon index funds in the Plan lineup when cheaper alternatives were available on the market.[7]  The theory fails because, as other courts have recognized, "nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)." *Hecker*, 556 F.3d at 586; *see also Tibble I*, 729 F.3d at 1136 (quoting same with approval); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 n.7 (8th Cir. 2009) ("[W]e do not suggest that a claim is stated by a bare allegation

---

[7] Plaintiffs identify the Vanguard Institutional Index Fund and the Fidelity Spartan International Index Advantage Fund as cheaper alternatives to the American Beacon S&P 500 Fund and International Equity Index Fund, respectively.  Compl. ¶¶ 70-72.  For a third index fund, Plaintiffs identify no comparator at all, and instead offer only a conclusory footnote that "[a] prudent investor similarly would have replaced the American Beacon Small Cap Index Fund with a less expensive index fund offering the same investment mix."  *Id.* ¶ 72 n.7.

that cheaper alternative investments exist in the marketplace."). Cost is a factor in selecting investment options, but it is not the only one, nor need it be dispositive. *See* DOL, ABC Plan 401(k) Plan Fee Disclosure Form for Services Provided by XYZ Company, http://www.dol.gov/ ebsa/pdf/401kfefm.pdf ("The service provider offering the lowest cost services is not necessarily the best choice for [a] plan." (emphasis omitted)).

Index funds are not an exception to that principle. While index funds "attempt[] to mimic the performance of a market index," Compl. ¶ 67, different managers seek to obtain this objective in different ways and do so with different levels of precision. The Complaint itself provides a clear example of such differences. Plaintiffs suggest that instead of investing in the American Beacon International Equity Index Fund, the Plan could have invested in the Fidelity Spartan International Index Advantage Fund, a fund with a lower expense ratio that also seeks to "mimic the MSCI EAFE Index." *Id.* ¶ 71. The funds' SEC filings, however, reveal that, even net of fees, the two funds have performed differently. For instance, the 2013 Annual Report for the Fidelity fund reported underperformance versus the MSCI EAFE Index over a 10-year horizon, while the Annual Report for the American Beacon fund reported beating that benchmark over roughly the same period.[8]

Strategy and performance, moreover, are not the only distinguishing features among index funds seeking to mimic the same index. Index funds also differ in the services they

---

[8] *Compare* Fidelity Concord Street Trust, Certified Shareholder Report of Registered Management Investment Companies (Form N-CSR) (April 25, 2013) (excerpt attached as Barrett Decl. Ex. I, at AA-APP697-98), https://www.sec.gov/Archives/edgar/data/819118/00002753091 3000039/main.htm *with* American Beacon Funds, Certified Shareholder Report of Registered Management Investment Companies (Form N-CSR) (Mar. 7, 2013) (excerpt attached as Barrett Decl. Ex. J, at AA-APP706), https://www.sec.gov/Archives/edgar/data/809593/00011931251309 5511/d495391dncsr.htm. American Beacon also notes in its filing that it invests in only a "subset of the securities" in the MSCI EAFE Index, leaving substantial room for discretionary choices with respect to which its decision-making might have differed from Fidelity's. *Id.* at AA-APP707.

provide investors and plans, the terms the managers impose on plans seeking to add the funds to

the lineup (*e.g.*, some firms might require a plan to use the firm as a recordkeeper in order to

obtain a rate, and others might require the use of multiple firm-sponsored funds), and general

manager reputation.  *Cf.*  Investment Company Institute, *Are S&P 500 Index Mutual Funds

Commodities,* Perspective Vol. 11 No. 3 (Aug. 2005), https://www.ici.org/pdf/per11-03.pdf

(concluding that "S&P 500 index funds are not commodities" and describing various differences

among S&P 500 Index funds that may explain fee differences).[9]  The Complaint says nothing

about these other features; it simply recycles the tired and flawed position that cheaper is

necessarily better, and that the failure to seek out the fund with the lowest cost is always

indicative of an imprudent process.  That position has been soundly rejected by other courts as

invalid and insufficient.  Plaintiffs' cheaper index fund claim should be dismissed.[10]

---

[9] Still other factors can differentiate the merits of seemingly similar index funds.  Plaintiffs, for example, suggest that the fiduciaries should have offered the Vanguard S&P 500 Index fund instead of the American Beacon S&P 500 Index Fund.  In recent years, however, Vanguard has operated under the cloud of investigations by the IRS and state taxing agencies based on whistleblower allegations that its lower fees stem in significant part from illegal tax avoidance.  David C. Johnston, *Vanguard Whistleblower Could Get Billions in Tax Dodge Complaint*, Newsweek (Dec. 3, 2015) (attached as Barrett Decl. Ex. K, at AA-APP709-717), http://webcache .googleusercontent.com/search?q=cache:g2hYanQFNksJ:www.newsweek.com/2015/12/25/vang uard-whistleblower-tax-dodge-complaint-400901.html+&cd=1&hl=en&ct=clnk&gl=us.

[10] Plaintiffs attempt to bolster their cheaper index fund claim by pointing out that the Plan fiduciaries removed the American Beacon index funds when they overhauled the Plan's lineup in October 2015.  The mere fact, however, that the fiduciaries, in response to dramatic changes in the Plan's size and participant base, chose to take a new course with the Plan's investments does not support an inference that the prior course was imprudent.  "Allegations regarding subsequent, prudent conduct do not serve as evidence that prior conduct was imprudent," and a fiduciary's "decision to change funds [does] not sustain allegations that [any fund] was an imprudent choice previously."  *Laboy v. Bd. of Trustees of Bldg. Serv. 32 BJ SRSP*, 2012 WL 3191961, at *3 (S.D.N.Y. Aug. 7, 2012) ("It would turn the law on its head were we to embrace a concept where a plaintiff could use allegations of prudent measures to prove a defendant's imprudence: a trustee might hesitate to replace a fund in its plan out of fears that such action could later be used to sustain a claim for breach of fiduciary duty."), *aff'd*, 513 F. App'x 78 (2d Cir. 2013).

2.      *Plaintiffs Have Failed To State A Claim For The Failure To Remove Underperforming Funds*

Plaintiffs separately assert that the fiduciaries acted imprudently by not removing three allegedly poor-performing American Beacon funds from the Plan's lineup—or by not removing them as quickly as Plaintiffs contend they should have.   The implicit premise of this claim is that an investment fiduciary must assume from a fund's short-term underperformance that the fund is an unacceptable long-term investment, and that a fiduciary's failure to immediately remove the fund is itself sufficient indicia of an imprudent process.   Neither ERISA nor sound investment principles support that position.   *See New Orleans Employers Int'l Longshoremen's Ass'n., AFL-CIO Pension Fund v. Mercer Inv. Consultants*, 635 F. Supp. 2d 1351, 1377 (N.D. Ga. 2009) (crediting testimony that it is appropriate to monitor an underperforming fund "for a period of time, to see whether its performance might improve" and finding retention of fund that underperformed benchmark on three-year trailing basis in consecutive years not imprudent); *cf.* SEC, *Invest Wisely: An Introduction to Mutual Funds*, https://www.sec.gov/investor/pubs/inw smf.htm ("A fund's past performance is not as important as [one] might think…. [R]ankings, and ratings often emphasize how well a fund has performed in the past.   But studies show that the future is often different.   This year's 'number one' fund can easily become next year's below average fund.").   As the SEC requires investment managers to caution investors, past performance does not guarantee future results, 17 C.F.R. § 230.482(b)(3)(i), and there is thus nothing inherently unreasonable in a fiduciary monitoring an underperforming fund for a period of time before making a removal decision or following a reasoned belief that a fund is likely to rebound as economic conditions change.   The Complaint fails to take account of such considerations, and its performance-based attacks are therefore inadequate to support an inference of imprudence.

14

These failings are evident in Plaintiffs' challenges to the fiduciaries' retention of the American Beacon Large Cap Growth Fund and the American Beacon Treasury Inflation Protected Securities ("TIPS") Fund.  The Complaint says nothing about the nature of either fund, offers no theory as to why either fund underperformed, and suggests no reason why any underperformance was a sign of longer-term concerns.  Rather, the Complaint merely alleges that each fund underperformed its peers and benchmark at a particular point in time, and asserts that the funds should have been removed from the Plan then and there.  Specifically, Plaintiffs assert that the Large Cap Growth Fund—which was removed from the Plan's lineup in mid-2012—should have been removed in mid-2010, when it reported underperformance against its benchmark on a 1-, 3-, and 5-year basis.  Compl. ¶ 77.  And they assert that the TIPS Fund should have been removed from the lineup when it reported underperformance against its benchmark and its peers at year-end 2011.  Compl. ¶ 78.

Review of the funds' performance at other points in time, however, reveals the insufficiency of these point-in-time attacks.  While Plaintiffs chose to measure performance as of mid-2010, an investor reviewing the Fund's performance as of year-end 2010—just a few months later—would have seen that the Fund had outperformed the Lipper Large Cap Growth Fund Index[11] in two of the past three years, including in 2010.[12]  And although the Fund

---

[11] As explained in American Beacon's SEC filings, which used the Lipper Large-Cap Growth Funds Index as a comparator for the American Beacon Large Cap Growth Fund, "Lipper is an independent mutual fund research and ranking service," and the Index "tracks the results of the 30 largest mutual funds in the Lipper Large-Cap Growth Funds category."  American Beacon Funds, Registration Statement Under the Securities Act of 1933 (Form N-1A) (Feb. 27, 2009) (excerpt attached as Barrett Decl. Ex. L, at AA-APP728 n.2), https://www.sec.gov/Archives/edgar/data/809593/000095013409004056/d66579e485bpos.htm.

[12] American Beacon Funds, American Beacon Large Cap Growth Fund Summary Prospectus (Form 497k) (Mar. 1, 2011) (excerpt attached as Barrett Decl. Ex. M, at AA-APP732), https://www.sec.gov/Archives/edgar/data/809593/000095012311020829/d80152e497k.htm (showing American Beacon fund returns of 15.39% in 2010 and -39.13% in 2008, and Lipper Index

allegedly experienced subsequent underperformance, the fiduciaries removed it from the Plan by

mid-2012, and the Complaint offers no facts from which the Court can infer that the intervening

period was an unreasonable period of time to monitor an underperforming fund (particularly

taking into account the need to identify a replacement and provide notice to participants before

an actual change).  The absence of such factual allegations is all the more glaring given that

American Beacon itself had taken steps to address underperformance concerns by replacing one

of the fund's investment managers just a year prior to Plaintiffs' suggested removal date, giving

the Plan's fiduciaries further reason to monitor the Fund before making a final decision.[13]

The TIPS Fund's performance is even more demonstrative of the flaw in Plaintiffs' point-

in-time approach.  Whatever underperformance the fund may have reported as of year-end 2011,

it performed well in subsequent years:  as of the end of 2015 (shortly before the filing of the

Complaint), the TIPS Fund was outperforming the Morningstar inflation-protected bond fund

average over both 1-year, and 5-year trailing periods, and its average annual return of 3.35%

over the trailing 10-year period was more than 10% greater than the Morningstar average of

returns of 15.13% in 2010); Ex. L, at AA-APP727-28 (showing Lipper Index returns of -41.39%
in 2008).

[13] *See* American Beacon Funds, Certified Shareholder Report of Registered Management
Investment Companies (Form N-CSR) (Jan. 7, 2011) (excerpt attached as Barrett Decl. Ex. N, at
AA-APP740-742), https://www.sec.gov/Archives/edgar/data/809593/000095012311001531/d78
586nvcsr.htm (noting the replacement of Goldman Sachs as fund manager, and explaining that
renewal of management agreement with replacement manager was "appropriate" given the
"relatively short tenure" of the new management team).  As explained in the Fund's Annual
Report, American Beacon uses a "manager of manager structure" for all of its funds, wherein
American Beacon "oversee[s] the provision of all investment advisory, [and] fund management"
services, but fund assets "are managed [by] multiple investment advisors which have entered into
separate … agreements with" American Beacon.  *Id.* at AA-APP738.  This structure allows the
fund itself to change its underlying portfolio management team on short notice, providing
investors the opportunity to obtain different investment management without incurring the costs
of switching to a different fund.  *See In re Hillview Investment Trust II and Hillview Capital
Advisors, LLC*, Investment Company Act Release No. 25055, 66 Fed. Reg. 35676–01, at 35676
(July 6, 2001).

3.01%.[14]  Had the Plan's fiduciaries reacted rashly in 2011—as Plaintiffs suggest they were required to do—participants would have lost the benefit of that performance.

  Plaintiffs' attack on the retention of the American Beacon Short-Term Bond Fund is similarly insufficient and flawed.  Plaintiffs contend that the fiduciaries should have removed the Fund from the Plan lineup by the end of 2011, when its reported returns allegedly trailed both the benchmark Plaintiffs have assigned to it, and its peer-group average.  In doing so, however, they combine the error of viewing a fund's performance without consideration of its strategy or structure, with the mistake of assessing fiduciary decision-making through a hindsight lens.

  One of the key investment factors Plaintiffs ignore is risk.  Any investment must strike a balance between maximizing potential returns and minimizing risk,[15] and American Beacon's public filings reflect that its Short-Term Bond Fund struck that balance near the conservative end of the spectrum for short-term bond funds.  For example, the Fund's summary prospectus explained that the Fund would only invest in "investment grade" bonds (as compared to higher-

---

[14] *Compare* American Beacon Funds, Certified Shareholder Report of Registered Management Investment Companies (Form N-CSR) (Mar. 10, 2016) (excerpt attached as Barrett Decl. Ex. O, at AA-APP748), https://www.sec.gov/Archives/edgar/data/809593/000119312516500003/d127659dncsr.htm (showing the American Beacon fund's 1-, 5-, and 10-year trailing returns as of Dec. 31, 2015, were -0.10%, 1.61%, and 3.35%, respectively) *with* BlackRock, Inflation Protected Bond Fund (excerpt attached as Barrett Decl. Ex. P, at AA-APP750), https://www.blackrock.com/investing/products/227589/blackrock-inflation-protected-bondinst-class-fund (select 31-Dec-2015 from drop-down menu) (showing the Morningstar Inflation-Protected Bond Fund category average 1-, 5-, and 10-year trailing  returns as of Dec. 31, 2015, were -2.36%, 1.55%, and 3.01%, respectively).  Morningstar classifications, such as the "Inflation-Protected Bond Fund" category, "help investors make meaningful comparisons between mutual funds …. by breaking portfolios into peer groups based on their holdings."  Morningstar, *The Morningstar Category Classifications* (Apr. 29, 2016) (excerpt attached as Barrett Decl. Ex. Q, at AA-APP760), http://morningstardirect.morningstar.com/clientcomm/Morningstar_Categories_US_April_2016.pdf.  Morningstar assigned the "Morningstar TIPS Index" cited by Plaintiffs as an index for the "Inflation-Protected Bond" fund category, *id.* AA-APP762, but it is not investable, and so is of little relevance in determining whether there were alternative courses of action the fiduciaries should have taken.

[15] SEC, *Beginners' Guide to Asset Allocation, Diversification, and Rebalancing*, https://www.sec.gov/investor/pubs/assetallocation.htm (explaining risk-reward tradeoff).

risk/higher-return "high-yield" bonds).[16]  American Beacon also disclosed that it would seek to

"maintain a duration of one to three years" for the Fund—"duration" being a measure of "how

much the price of [the] bond investment is likely to fluctuate when there is an up or down

movement in interest rates."[17]  The higher an investment's duration, the more the value of the

investment will fall in response to an increase in interest rates.  Thus, by maintaining a low

duration, American Beacon insulated the Fund against the effects of a sudden interest rate hike.

Other short-term bond fund managers were not so cautious.  As reflected in the financial

press, many investment managers, for example, responded to the historically low interest rates

that existed in the wake of the financial crisis by including higher-risk/higher-return "high-yield"

bonds in their portfolios.[18]  Similarly, although Plaintiffs suggest that some short-term bond

funds use the "Barclays 1-5 Yr Govt/Credit Index" as a benchmark, *see* Compl. ¶ 76 n.8—an

---

[16] SEC, *Bonds*, https://www.investor.gov/investing-basics/investment-products/bonds
(explaining difference between "investment-grade" and "high-yield" bonds); American Beacon
Funds, American Beacon Short-Term Bond Fund Summary Prospectus (Form 497k) (Mar. 1,
2011) (excerpt attached as Barrett Decl. Ex. R, at AA-APP766), https://www.sec.gov/Archives/e
dgar/data/809593/000095012311020831/d80160e497k.htm ("The Fund will only buy debt
securities that are determined by the Manager to be investment grade at the time of purchase.").

[17] Ex. R, at AA-APP766 ("Under normal circumstances, the Fund seeks to maintain a
duration of one to three years.  A duration of 'one year' means that a security's price would be
expected to decrease by approximately 1% with a 1% increase in interest rates."); Financial
Industry Regulatory Authority, *Duration—What an Interest Rate Hike Could Do to Your Bond
Portfolio* (Mar. 2013), https://www.finra.org/investors/alerts/duration-what-interest-rate-hike-
could-do-your-bond-portfolio (explaining relationship between duration and interest rate risk).

[18] American Beacon Funds, Certified Shareholder Report of Registered Management
Investment Companies (Form N-CSR) (Jan. 1, 2013) (excerpt attached as Barrett Decl. Ex. S, at
AA-APP778), https://www.sec.gov/Archives/edgar/data/809593/000119312513005419/d458468
dncsr.htm (explaining that in deciding to renew the management agreement for the fund in 2012,
the "Trustees considered the [fund's] performance relative to its benchmark because the peer
universe median and Lipper Index include many funds that invest a large percentage of their
assets in high yield securities, whereas the [fund] may invest only in investment-grade
securities"); *see also* Tom Lauricella, *A Safer Junk Strategy*, Wall St. J. (Oct. 3, 2012), http://ww
w.wsj.com/articles/SB10000872396390444813104578016830257907650 (explaining popularity
of short-term high-yield bond funds in low-interest-rate post-financial-crisis period).

index of debt securities "with maturities of one to five years"[19]—the American Beacon Fund

adopted and disclosed its more conservative approach by comparing its performance to that of a

shorter-duration index, one of debt securities "with maturities between one and three years."[20]

As courts have stressed,  fiduciary decision-making "involves a balancing of competing

interests under conditions of uncertainty," *Bunch*, 555 F.3d at 7 (quotation omitted), and there is

nothing inherently imprudent about a plan fiduciary's decision to accept somewhat lower returns

in return for the safeguards of a more conservative investment approach.  *Jenkins v. Yager*, 444

F.3d 916, 925-26 (7th Cir. 2006) (explaining that, despite "years of lower performance,"

"investment strategy" of "find[ing] long-term, conservative, reliable investments that would do

well during market fluctuations" was neither "unreasonable [n]or imprudent").  While it may

seem clear today that the Plan could have achieved greater returns by selecting a more

aggressively managed fund, that is a conclusion that can only be made with hindsight—a plainly

improper basis for judging fiduciary decision-making.  *See Laborers Nat'l Pension Fund v. N.*

*Trust Quantitative Advisors, Inc.*, 173 F.3d 313, 317 (5th Cir. 1999) (ERISA's prudence test is

"not a test of the result of performance of the investment." (citation omitted)); *St. Vincent*, 712

F.3d at 716 ("[W]e judge a fiduciary's actions based upon information available to the fiduciary

at the time of each investment decision and not from the vantage point of hindsight…."

---

[19] Barclays, *Benchmark Definitions* 13 (excerpt attached as Barrett Decl. Ex. T, at AA-APP782), https://wealth.barclays.com/content/dam/bwpublic/americas/documents/shared/benchmark-definitions-americas.pdf.

[20] Ex. S, at AA-APP776.  When compared to the benchmark index actually cited in the Fund's Annual Reports, the Fund's performance appeared much better.  As of year-end 2011, for example, the Fund's returns were greater than the index's returns in two of the three previous years (including by almost 40% in 2009).  *See* Ex. R, at AA-APP768-69 (showing Fund returns of 2.89% in 2010 and 5.04% in 2009, and index returns of 2.82% in 2010); American Beacon Funds, Registration Statement Under the Securities Act of 1933 (Form N-1A) (May 4, 2010) (excerpt attached as Barrett Decl. Ex. U, at AA-APP792), https://www.sec.gov/Archives/edgar/data/809593/000089843210000648/a485bpos.htm (showing index returns of 3.83% in 2009).

(quotation omitted)); *New Orleans Employers*, 635 F. Supp. 2d 1372 ("The results of the fiduciary's investment decision are not the focus of the inquiry.  Rather, the fiduciary's conduct is to be evaluated …. without the benefit of hindsight." (citation omitted)).  For example, if the Federal Reserve had elected to allow the historically low short-term interest rates to move back toward more normal levels, longer duration short-term bond funds would have suffered while conservative funds (like the American Beacon fund) would have been better positioned.[21]  That this possibility did not manifest does not mean that investment in a fund that insured against it and other risks was imprudent.  Plaintiffs' attack on the Short-Term Bond Fund does no more than point out in hindsight that a conservatively managed fund underperformed in economic conditions that disfavored conservatively managed funds.  That does not support an inference of an imprudent decision-making process.

### C.     It Was Not Imprudent To Include Mutual Funds In The Plan Lineup

Plaintiffs' final Count I claim is that it was imprudent to include mutual funds as Plan investment options because the Plan could have instead invested in lower-cost separate accounts or collective trusts.  Compl. ¶¶ 81-87.  Here again, Plaintiffs' theory rests on the false premise that fiduciaries must pursue the cheapest investment products to the exclusion of all other considerations.  Courts have not only squarely rejected that premise—they have rejected the very categorical attack on the inclusion of mutual funds in plan lineups that Plaintiffs press here.  *See,*

---

[21] Financial trade press articles from 2010 through 2014 revealed sharp, continuous divisions of opinion on whether the Federal Reserve would allow short-term interest rates to rise in the near term.  *See, e.g.*, Wall Street Journal, *Economic Forecasting Survey*, Wall St. J.  (Jan. 2011), http://projects.wsj.com/econforecast/#ind=fed_ funds&r=16&e=87 (Select "2011-01-01" edition and select "Download data") (asking "When will the Fed begin raising rates?" to which 37% of surveyed economists predicted 2011 and 55% predicted 2012); Ben Baden, *When Will The Fed Finally Raise Rates?*, US News & World Rpt. (Apr. 28, 2010), http://money.usnews.com/ money/blogs/fund-observer/2010/04/28/when-will-the-fed-finally-raise-rates- ("No one is certain when the Fed will increase rates ….").

*e.g.*, *Loomis v. Exelon Corp.*, 658 F.3d 667, 671-73 (7th Cir. 2011); *Hecker*, 569 F.3d at 711;

*Taylor v. United Techs. Corp.*, 2009 WL 535779, at *10 (D. Conn. Mar. 3, 2009), *aff'd*, 354 F.

App'x 525, 527 (2d Cir. 2009).

As those courts have recognized, mutual funds offer advantages that the institutional

products cited by Plaintiffs generally do not.  Unlike many institutional products, "brand-name

mutual funds are generally easy to track via newspaper or internet sources."  *Tibble I*, 729 F.3d at

1134.  Mutual funds are also uniquely subject to intense regulatory schemes designed to ensure

oversight and transparency.[22]  Given these recognized mutual fund advantages, it cannot

reasonably be inferred that separate accounts (or other non-mutual fund products) are

unquestionably superior—or that offering mutual fund options is inherently imprudent—just

because separate accounts are allegedly less expensive.  Indeed, ERISA ***expressly contemplates***

plan investments in mutual funds, ERISA § 3(21)(B), 29 U.S.C. § 1002(21)(B), reflecting

Congress's judgment that such options are not categorically imprudent 401(k) investments.

Plaintiffs try to salvage their claim by asserting, in conclusory fashion, that Defendants

did not "adequately investigate [the use of] nonmutual fund alternatives such as collective trusts

and separately managed accounts." Compl. ¶ 81.  But the mere presence of mutual funds in the

---

[22] *See, e.g.*, *Tibble I*, 729 F.3d at 1134 ("Mutual funds, however, have a variety of unique regulatory and transparency features that make it an apples-to-oranges comparison to judge them against [separate accounts and commingled trusts]."); *Renfro v. Unisys Corp.*, 671 F.3d 314, 318 (3d Cir. 2011) (mutual funds "are subject to a variety of reporting, governance, and transparency requirements that do not apply to other investment vehicles").  Mutual funds provide: (1) information transparency, with standardized disclosure of investment risk, performance, fees, and periodic reports of fund holdings, 15 U.S.C. §§ 80a-8, 80a-30; SEC Form N-1A, https://www.sec.gov/about/forms/formn-1a.pdf; (2) governance by a board, the majority of whose members must be independent of the adviser, 17 C.F.R. § 270.0-1(a)(7); (3) substantive investment regulation, such as requiring diversification and limiting leverage, 15 U.S.C. § 80a-18(a)(1)-(f); 26 U.S.C. § 851(b)(3); and (4) a compliance regime dictated by SEC regulation, including written procedures under the direction of the chief compliance officer and regulation by Sarbanes-Oxley, 15 U.S.C. § 7241(a); 17 C.F.R. § 270.38a-1.

lineup—the only relevant fact alleged—does not provide plausible support for that inference.

Thus, Plaintiffs offer no more than a dressed-up version of the categorical attack on mutual funds

that other courts have rejected.  That attack should be rejected here as well.

> **D.     Count I Should, At A Minimum, Be Dismissed Against The Defendants Not Responsible For The Selection Of The Plan's Investment Options**

For the reasons already stated, Count I should be dismissed against all Defendants.  Short

of that, it should, at a minimum, be dismissed as to American Airlines, the PBAC, and the BSC.

Under ERISA, a person is only a fiduciary "to the extent" that:

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).  Because a person is a fiduciary only "to the extent" it performs

fiduciary functions, a fiduciary as to one function is not necessarily a fiduciary as to others.

*Pegram v. Herdrich*, 530 U.S. 211, 225-26 (2000).[23]  Thus, "[i]n every case charging breach of

ERISA fiduciary duty … the threshold question is … whether [the defendant] was acting as a

fiduciary (that is, was performing a fiduciary function) when taking the action subject to

complaint."  *Id.* at 226.

Although Plaintiffs assert that American Airlines, the PBAC, and the BSC were Plan

fiduciaries, they allege no facts suggesting that any of them had fiduciary responsibility over the

selection or removal of the Plan's investment options.  Rather, as the Complaint acknowledges,

---

[23] *Johnson v. Ga.-Pac. Corp.*, 19 F.3d 1184, 1188 (7th Cir. 1994) ("A person 'is a fiduciary to the extent that' he performs one of the described duties; people may be fiduciaries when they do certain things but be entitled to act in their own interests when they do others."); *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1158 (3d Cir. 1990) ("Fiduciary duties under ERISA attach not just to particular persons, but to particular persons performing particular functions.").

that authority was specifically assigned to the PAAC and, later, the EBC. *See* Compl. ¶ 24 ("The PAAC's authority to appoint investment managers gave it responsibility for selecting, monitoring, and removing investment options within the Plan."); *id.* ¶ 27 ("The EBC is also responsible for selecting and monitoring the Plan's administrative service providers, including the Plan's recordkeeper and trustee"); *see also* 2009 Plan Document, § 12.2 (AA-APP248-49); 2014 Plan Document, § 12.2 (AA-APP451-52); 2015 Plan Document, § 12.2 (AA-APP661-62). Because American Airlines, the PBAC, and the BSC had no authority over the selection or removal of Plan investment options, they cannot be liable as fiduciaries for not removing the allegedly imprudent funds.

## II.   COUNT II SHOULD BE DISMISSED BECAUSE PLAINTIFFS FAIL TO STATE A CLAIM FOR THE BREACH OF THE DUTY TO MONITOR

In Count II, Plaintiffs seek to hold all of the Defendants, with the sole exception of the PAAC, liable under a theory that they failed to monitor other Plan fiduciaries. Compl. ¶¶ 106-13. But, although some courts have recognized a fiduciary duty by the entities that appoint fiduciaries to monitor those they appoint, the Fifth Circuit recently stated in *Perez v. Bruister*, __ F.3d __, 2016 WL 2343009 (5th Cir. May 3, 2016), that it "has never recognized this theory of ERISA fiduciary liability" and "did not approve" of the district court's holding that the defendant breached a fiduciary duty by appointing trustees and knowing that those trustees had breached their fiduciary duties. *Id.* at *5 n.10.[24]

---

[24] Even courts that have recognized a duty to monitor have expressly tied it to the power to appoint and remove fiduciaries. *See, e.g.*, *Chesemore v. Alliance Holdings, Inc.*, 886 F. Supp. 2d 1007, 1050 (W.D. Wis. 2012) (dismissing defendant because there were no allegations in the complaint that it appointed the entity that committed the underlying breach). Plaintiffs, however, lob almost all of the Defendants into Count II without regard to whether those Defendants had responsibility for appointing those fiduciaries that the Complaint alleges engaged in an underlying breach. For example, Count II asserts that the EBC had a duty to monitor the fiduciaries responsible for the selection and monitoring of the Plan's investment options. Compl.

This Court, however, need not adjudicate the existence of a duty to monitor in order to dismiss Count II. As the Fifth Circuit recognized in an earlier opinion, to the extent a duty to monitor claim may be said to exist, it is a derivative claim that depends on an underlying breach by the monitored fiduciary. *See, e.g.*, *Kopp v. Klein,* 722 F.3d 327, 344 (5th Cir. 2013) (dismissing "derivative" claim for breach of duty to monitor fiduciaries along with underlying claims), *vac'd on other grounds*, 134 S. Ct. 2900 (2014).[25] For the reasons addressed above with respect to Count I, Plaintiffs have failed to allege sufficient facts to establish any such underlying breach and thus, like Count I, Count II should be dismissed.

But even if Plaintiffs' allegations were sufficient to state a claim under Count I (they are not), those allegations would still be insufficient to state a claim for breach of the duty to monitor. Courts recognizing a duty to monitor have made clear that that "responsibility" does not "expose[] the appointing fiduciary to open-ended liability." *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1466 n.10 (4th Cir. 1996) (noting that "courts have properly taken a restrictive view of the scope of this duty and its attendant potential for liability."). The Seventh Circuit, for example, recognized a duty to monitor but emphasized that the duty should not be interpreted to require an appointing entity to "review all business decisions" of the appointed fiduciaries,

¶ 107. But the Complaint alleges that the EBC has been the fiduciary with that investment responsibility since the time of its existence. *Id.* ¶ 27. Count II, in other words, contends, illogically, that the EBC has a duty to monitor **itself.**

[25] *See also Rinehart v. Akers*, 722 F.3d 137, 154 (2d Cir. 2013) ("Plaintiffs cannot maintain a claim for breach of the duty to monitor by the Director Defendants absent an underlying breach of the duties imposed under ERISA by the Benefit Committee Defendants."), *vac'd on other grounds,* 134 S. Ct. 2900 (2014), *and reaffirmed by Rinehart v. Lehman Bros. Holdings Inc.*, 2016 U.S. App. LEXIS 5114, at *17 (2d Cir. Mar. 18, 2016); *Ramirez v. J.C. Penney Corp.*, 2015 WL 5766498, at *3 (E.D. Tex. Sept. 29, 2015) ("Breach of the duty to monitor is a derivative claim; the fiduciary being monitored must have committed an underlying breach of duty in order for the monitoring fiduciary to be held liable under this theory."); *In re BP p.l.c. Sec. Litig.*, 2015 WL 6674576, at *9 (S.D. Tex. Oct. 30, 2015) ("To prevail on [a duty to monitor claim], [p]laintiffs must adequately state a claim for an underlying breach of fiduciary duty by the appointed fiduciary.") (quotation omitted).

pointing out that such "standard would defeat the purpose of having trustees appointed to run a benefits plan in the first place." *Howell v. Motorola, Inc.*, 633 F.3d 552, 573 (7th Cir. 2011). But that is precisely the standard that Count II suggests. Plaintiffs seek to infer inadequate monitoring from the mere alleged facts that the Count II Defendants did not remove either the challenged investment options or the PAAC or EBC members responsible for their selection and retention. Compl. ¶ 111. Plaintiffs, however, allege no facts indicating how the Count II Defendants could have concluded that the PAAC or the EBC was imprudent in retaining those options short of engaging in the very type of investment-decision-by-investment-decision review that would defeat the purpose of assigning investment responsibility to a particular committee in the first place. Accordingly, even if Plaintiffs have adequately alleged the retention of an imprudent investment option, they have failed to adequately allege a duty to monitor.

## CONCLUSION

Defendants respectfully requests that the Court dismiss the Complaint with prejudice.

Respectfully submitted,

Dated: June 10, 2016

*/s/ Lars L. Berg*
Dee J. Kelly, Jr. (S.B. # 11217250)
Lars L. Berg (S.B. # 00787072)
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Tel.: (817) 332-2500
Fax: (817) 878-9280
dee.kelly.2@kellyhart.com
lars.berg@kellyhart.com

Brian D. Boyle (*pro hac vice pending*)
(D.C. Bar # 419773)
Shannon M. Barrett (*pro hac vice pending*)
(D.C. Bar # 476866)
Meaghan VerGow (*pro hac vice pending*)

25

(D.C. Bar # 977165)
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Tel.: (202) 383-5300
Fax: (202) 383-5300
bboyle@omm.com
sbarrett@omm.com
mvergow@omm.com


*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

On June 10, 2016, a true and correct copy of the foregoing document was served upon all persons who have requested notice and service of pleadings in this case via the Court's CM/ECF system.

/s/ Lars L. Berg
Lars L. Berg